JAMES BALDRIDGE V. JOEL F. SCOTT ET AL.

1. SEPARATE PROPERTY.—B having become insolvent in the State of Virginia, his property was sold and purchased by C, the brother of F, who was B's wife. The property thus purchased was given by C to F, for the purpose of securing her a home in Texas. A homestead was afterwards purchased in Texas, the deed to which was made to F, but there was no evidence as to who furnished the purchase-money. At the time, and after the purchase, B declared that it was his intention to make the land purchased the separate property of his wife, and so represented it to other parties. B afterwards caused the will of F to be written, in which the land was treated as her separate property. After the death of F, B, who was named in it as executor, had the will probated, and acted under letters of executorship. He also permitted his children to manage the property, in pursuance of the terms of the will, and returned an inventory of the estate, in which the land was treated as the property of F's estate: *Held*, That the land was, at the time of F's death, her separate property.

2. PURCHASER—FRAUD.—A purchaser cannot make a valid contract with one who sells to him under a power, when he has notice that the sale is fraudulent, and made for a different purpose from that for which the power was given, by which he will aid in the perpetration of a wrong done to another.

3. FRAUD.—See opinion for facts held sufficient to authorize the setting aside of a sale made by an executor for fraud.

4. JUDGMENT—PRESUMPTION.—When a jury is waived, and a cause is determined by the presiding judge, his finding will be regarded

with the same presumption in its favor as though the facts had been found by a jury.

ON REHEARING.

5. MOTION FOR REHEARING IN SUPREME COURT.—The "fifteen days after the date of entry of judgment or decision" counts from the day of rendition of the same, it being presumed that the entry of judgment was made at its rendition.

6. SAME.—It is not sufficient that a motion for rehearing be filed within fifteen days after the reading of such entry in court.

7. SAME—EXTENSION OF TIME.—There might be circumstances excusing such delay, or the nature of the error into which the court may have fallen might be such, that the court, on discovering its error, would during the term correct it, or grant a rehearing.

APPEAL from Washington.  Tried below before the Hon. J. B. McFarland.

This was a suit of trespass to try title, brought by J. F. Scott and the other children of Mrs. N. C. J. Scott, their mother, to recover a tract of land occupied by the father and mother as a homestead at the time of the mother's death. The appellant, Baldridge, set up title under a conveyance from Joel Scott, the executor of the will of N. C. J. Scott, and her surviving husband.

It was alleged, in the amended petition, that N. C. J. Scott resided on the land at the time of her death, and that she owned no other real estate; that her husband, Joel J. Scott, was appointed by her, executor of her will; that he failed to accept the trust in the manner required by law; that he did not qualify as executor until about two years after their mother's death; that he filed no inventory of the estate until February 1, 1870, about four years after the filing of the will; that about February 4, 1870, the day on which the inventory was approved, their father, the said Joel J. Scott, delivered to defendant a pretended deed to the land in controversy; that said pretended sale and conveyance made by said J. J. Scott to said defendant was made without any lawful authority, and in utter disregard and violation of the title and rights of said plaintiffs, and contrary to the

provisions of said last will and testament of said N. C. J. Scott, deceased; that there was no necessity nor reason for sale of said tracts of land; that there were then, and at the time of pleading, no debts, demands, or liabilities against, nor in favor of, said estate of said N. C. J. Scott, deceased, and that said J. J. Scott had no right or authority from the County Court of said county, nor under said last will, to sell or convey said tracts of land; that said defendants, with full knowledge of said facts, and of the title and rights of plaintiffs, fraudulently conspired and combined with said J. J. Scott, for the purpose of procuring said pretended sale and conveyance, and of obtaining possession of said tracts of land, and of the rents and profits thereof; that in pursuance of said fraudulent combination, said pretended inventory was filed as aforesaid, solely with a view of making said conveyance, and for the purpose of giving some color of authority to the acts of said J. J. Scott to said defendant, as executor of said will and estate. Plaintiffs further alleged, that this pretended sale and conveyance, made by said J. J. Scott to said defendant as aforesaid, and under and by virtue of which said defendant claimed title to said tracts of land, was fraudulently and collusively made, for the purpose of defrauding said plaintiffs of their rights to said land, and of depriving them of their home, and that the same was illegal, null and void, to all intents and purposes; that said J. J. Scott never executed any bond as executor of said estate, and never qualified or gave bond as administrator, or as administrator with will annexed, of said estate, and complied with the law in regard to the administration of said estate, or as executor of said will, and that his acts as such executor were without authority of law, and null and void, and that all this was well known to defendant; that J. J. Scott was, at the date of his death, utterly insolvent, and left no estate or property whatever; that at and before the death of said N. C. J. Scott the plaintiffs, nor any of them, owned any property or estate whatever; that at, before, and since the death of their said mother, N. C. J.

Scott, and until dispossessed by defendant as aforesaid, all of plaintiffs resided upon said tracts of land, using and enjoying the same as a home, none of said plaintiffs having any other home or residence, and that said tracts of land, being cultivated by plaintiffs, furnished a comfortable home and subsistence to all of said plaintiffs; that three of said plaintiffs were partially and three of them totally blind, so as to be unfit for labor or business, and such was their condition when said will was made; that it was the wish and intention of said N. C. J. Scott, in her will, to provide a permanent home on said land for her children, which is designated therein as "the farm"; that it was not her intention that said lands should be sold; that all this was well known to defendant, who was a near neighbor of testator, and fully cognizant of the condition of plaintiffs and of the said facts.

The will of Mrs. N. C. J. Scott was as follows, viz.:

STATE OF TEXAS, ⎱
*Washington County.* ⎰

IN THE NAME OF GOD, AMEN. I, N. C. J. Scott, wife of Joel Scott, of said county and State, being of sound and disposing mind and memory, and being desirous of arranging and settling my worldly affairs while I have strength so to do, do make and publish this my last will and testament, hereby revoking all wills by me at any time heretofore made. And first I commit my soul to God who gave it, and my worldly affairs I dispose of as follows:

1. It is my will that all my just debts should be paid.

2. I will and bequeath to my children by my husband Joel Scott begot, each to share and share alike, all the property, real and personal, of every kind and description, of which I may die possessed.

3. It is my will that my property, of every description, should be kept upon the farm upon which I now reside, and employed in agriculture for the support of my children, and all proceeds and moneys arising from the sale of products of said farm, above the support and education of my children,

to be used and invested by my executor, hereafter to be named, for the use and benefit of the estate, in such manner as in his judgment may be best.

4. It is my will that my executor shall have full control, management, and government, without restriction or limitation, of my estate; that he buy and sell and exchange any description of property whatsoever, belonging to said estate, when in his judgment it is best so to do.

5. It is my will that upon the marriage or maturity of my children, there shall be no partition or division of the estate, without the approval of my executor.

6. Having full confidence and trust in my husband, Joel Scott, I hereby appoint him my executor, to execute and discharge the provisions of this my last will and testament.

7. It is my desire that this will be placed upon the records of Washington county, and that my executor be relieved of giving bonds, also relieved from making returns to the court, as executor as aforesaid.

(Signed)         N. C. J. SCOTT.

Witnesses: O. A. NORWOOD.

J. F. GARDNER.

The will was filed and recorded September 21, 1864, but no application was made for probate until May 16, 1866, and the will was not probated until the August Term, 1866, of the Probate Court of Washington county. No inventory of the estate was filed until the 1st day of February, 1870, nearly six years after Mrs. Scott's death. Three days after the inventory was filed, to wit, February 4, 1870, J. J. Scott, signing as executor of the last will of N. C. J. Scott, deceased, executed a deed of conveyance for the farm or land in controversy to James Baldridge, the defendant, the consideration mentioned in the deed being $4,348.88 gold.

The defendant pleaded the general issue, "not guilty," and suggested valuable improvements, in good faith. On the 12th day of March, 1873, the cause came on for trial. By consent of parties, a jury was waived, and the matters in

controversy, as well of fact as of law, were submitted to the court.    Judgment was rendered in favor of plaintiffs for the tracts of land, and also for $2,040 damages, by way of rent; and from this judgment the defendant prosecutes this appeal.

The evidence before the judge trying the cause is sufficiently embodied in the opinion, in which will also be found reference to the character of title claimed by the testatrix.

The assignment of errors is general, that "the court erred in rendering judgment against the defendant on the law and the evidence," and points out no specific grounds of error.

*Sayles & Bassett* and *Giddings & Morris,* for appellant.—The first question presented by the record is,—Did the will of Mrs. Scott, under which appellees claim, confer authority upon the executor, Joel Scott, to sell the real property belonging to the estate ?   The language of the fourth clause of the will, under which this authority is claimed, was ample to confer this authority, unless the plain and literal import of the words used is restricted by the application of some rule by which the construction of wills is governed.    By that clause, she conferred upon her executor "full control, management, and government, without restraint or limitation, of her estate; that he buy and sell and exchange any description of property whatsoever, belonging to said estate, when in his judgment it is best so to do."

What is the executor to do with it ?   Having full confidence and trust in her husband, she directs that he shall have full control, management, and government of her estate, without restriction or limitation.    To leave no doubt of her meaning in the use of these words, she adds,—"that he may buy, sell, and exchange."

While the intention of the testator is the polar star to the interpretation of his will, that intention is to be gathered from his will only.    (Jackson v. Luquere, 5 Cow., 221.)    It is the expressed intention of the testator, which it is the duty of the courts to ascertain; i. e., the meaning which the words of the

will, properly interpreted, convey. (Arcularius *v.* Geisenhei-
ner, 3 Brad. Sur. Rep., 73 ; Hone *v.* Van Schaick, 3 Coms.,
540 ; Shore *v.* Wilson, 9 Cl. and F., 525 ; Abbott *v.* Middle-
ton, 7 H. L. C., 68.)

Wherever words have received a judicial determination,
the security of title requires that such construction be adhered
to. (Jackson *v.* Luquere, 5 Cowen, 221–228 ; Hay *v.* The
Earl of Coventry, 3 T. R., 86.) The term estate, used in the
fourth clause of the will, has a legal definition: it comprehends
real and personal property. (1 Salk., 236 ; Barnes *v.* Patch,
8 Ves., 604 ; Hawkins on Wills, 53.) In O'Toole *v.* Browne,
3 Ellis and Blackburn, 77 Eng. C. L., 578, Lord Campbell
said : "It is not necessary to argue the point that the word
estate, *prima facie,* includes land." The expression, " any de-
scription of property whatever, belonging to my estate," also
used in the same clause, has an equally comprehensive signi-
fication. (See, also, 6 Binn., 98 ; 4 Pet., 511 ; Clark *v.* Lud-
lam, 7 Bing., 273.)

The rule is thus stated in Hawkins on Wills, page 1, prop-
osition 2 : " In construing a will, the words and expressions
used are to be taken in their ordinary, proper, and gramma-
tical sense, unless, upon so reading them in connection with
the entire will, or upon applying them to the facts of the
case, an ambiguity or difficulty of construction, in the opin-
ion of the court, arises ; in which case the primary meaning
of the words may be modified, extended, or abridged, and
words and expressions supplied or rejected, in accordance
with the presumed intention, so far as to remove or avoid
the difficulty or ambiguity in question, but no further."

The fourth clause uses words not used in the third clause.
She confers upon her executor " full control, management,
and government, without restriction or limitation, of her es-
tate." The additional words add nothing to the power; but
to make her meaning clear, beyond doubt, as to what she in-
tended by " control," " management," " government," " with-
out restriction or limitation," she adds,—" to buy, sell, and

exchange any description of property whatever, belonging to said estate, when in his judgment it is best so to do."

The whole will shows the intention of the testatrix to bestow great power upon her executor. "Having full confidence and trust" in her husband, she appoints him to "execute and discharge the provisions" of her will. She excuses him from giving bond, and that he be released from making returns to the court, only requiring that the will be placed on the records. She directs that her just debts be paid, among which is a debt of about $5,000, secured by the vendor's lien upon her "farm." She wishes to provide for the support and education of her children, and that her executor shall retain the control of her property until he sees proper to partition it among her children.

To carry out these trusts, she confers upon her executor "full control, management, and government, without restriction or limitation, of her estate; that he buy and sell and exchange any description of property whatever, belonging to said estate, when in his judgment it is best so to do."

An irreconcilable repugnancy between the third and fourth clauses of the will does not defeat the right of appellant. If such repugnancy does exist, and the two clauses cannot stand together, the clause which is posterior in local position will prevail, and the subsequent words be considered as denoting a subsequent intention. (Co. Lit., 112, 6; 2 Blackst. Comm., 381; 1 Jarman on Wills, 411; Sherratt *v.* Bentley, 2 Myl. & K., 149; Constantine *v.* Constantine, 6 Ves., 102; Sims *v.* Doughty, 5 Ves., 247; Fane *v.* Fane, 1 Vern., 30; Covenhoven *v.* Shuler, 2 Paige, 122, 139; Smith *v.* Bell, 6 Pet., 68; Bradstreet *v.* Clark, 12 Wend., 665; Norris *v.* Beyea, 13 N. Y., 273.) It is only by construction that a prohibition of sale could be implied from the third clause, if that clause stood alone. A clear authority to sell is expressed in the fourth clause. "A clearly-expressed intent in one portion of the will, is not to yield to a doubtful expression in any other portion of the instrument." (1 Redfield on Wills, 433.) If

the third clause had been posterior in position, it would not have annulled the preceding clauses, in which power to sell was already given.

The rule as to the exclusion of extrinsic evidence is elementary, and is thus stated in Wigram on Wills, page 88: "Courts of law, in certain special cases, admit extrinsic evidence of intention, to make certain the person or thing intended, when the description in the will is insufficient for that purpose. It has been held, that parol evidence is inadmissible for the purpose of proving what was intended by an unintelligible word (3 Sim., 24); of reconciling conflicting clauses in a will (Ulrich *v.* Litchfield, 2 Atk., 373); of proving, that by a bequest of residue a particular sum was intended (Brown *v.* Langley, 2 Eq. Abr.; 416); of controlling a technical rule of verbal construction (6 T. R., 255); of explaining the sense in which words are used (1 Ves. Sr., 230; Amb., 70; 1 Bro. C. C., 31; 2 P. Wms., 419, 157; 2 Vern., 521, 625; 5 Ves., 85; Plow., 340; 3 T. R., 601).

There is no such error apparent upon the proceedings of the County Court as would authorize the reversal of the judgment, upon an appeal properly prosecuted for that purpose.

The judgment of the Probate Court, establishing the will, and appointing J. J. Scott executor, with full power to execute the trust, is the judgment of a court of competent jurisdiction, and until reversed or annulled, in a direct proceeding for the purpose, is conclusive. It cannot be drawn in question in a collateral action. (Box *v.* Lawrence, 14 Tex., 555.) In Ingram *v.* Ingram, Dallam, 519, cited with approbation in Box *v.* Lawrence, it is held, that when a will has been admitted to probate by a court of competent jurisdiction, the judicial act of the court of probate is conclusive of the rights of the parties, until the same be reversed or vacated, citing Brown *v.* Gibson, 1 Nott and McCord, 326; Lucas *v.* Bank of Darien, 2 Stewart, 280; Dufour *v.* Camfranc, 11 Mart., (La.,) 607.

The appellees, in reply to the presumption of community property arising from the character of the deed, urged, in the court below, that Scott and Baldridge, his vendee, were estopped from denying the separate title of Mrs. Scott, by the return of the inventory, describing it as her separate property.

The inventory is merely *prima-facie* evidence of title, and may be rebutted by proof that, in point of fact, the title was not in the testator, but in another, and the doctrine of estoppels has no application to the question. To constitute an estoppel, there must be an admission or act intended to influence the conduct of another, and actually leading him into a line of conduct which must be prejudical to his interest, unless the party estopped be cut off from the power of retraction. (Carroll *v.* Carroll, 20 Tex., 745; Dunham *v.* Chatham, 21 Tex., 248; Little *v.* Birdwell, 21 Tex., 602.) The inventory filed by Scott was *prima-facie* evidence that the land inventoried was the separate property of his wife. That presumption is rebutted by the production of the deed, which, upon its face, and by its terms, vests the property in Scott and wife as community property, and the burden of proof rests upon the appellees to show that it was the separate estate of Mrs. Scott, and that the fact was known to Baldridge. "Our whole system of marital rights is based upon the fact that acquisitions, either of the joint or separate labor or industry of the husband or wife, become common property; and, as a general rule deducible from this principle, all property acquired by purchase, or apparent onerous title, whether the conveyance be in the name of the husband or of the wife, or in the name of both, is, *prima facie*, presumed to belong to the community. It is true, that it is now a well-established and long-recognized rule of procedure in our judicial system, as between the parties to such deeds, their privies in blood, purchasers without value or with notice, parol evidence may affect the legal import of such deeds. But we know of no principle upon which such evidence can be received for the

purpose of explaining or modifying such deeds, after the property has passed into the hands of innocent purchasers, and thereby ingrafting upon it a trust to their detriment. Such a doctrine would go far to destroy the utility of written evidences of title to land, and the registration of conveyances for the purpose of notice. The inspection of a deed to a married woman, only charges a party with notice of the fact which its contents import: that is, that the property is community property." (Cooke *v.* Bremond, 27 Tex., 457.)

*Breedlove & Ewing*, for appellees, in a lengthy and able brief, argued the following propositions:

1. That the will conferred no authority upon the executor to sell and convey the land in controversy, citing Boyd *v.* Strahan, 36 Ill., 359; Smith *v.* Bell, 6 Pet., 80; Howze *v.* Howze, 19 Tex., 554; State Bank *v.* Ewing, 17 Ind., 69; 4 Kent's Comm., 534; Finlay *v.* King, 3 Pet., 356; Westcott *v.* Cady, 5 Johns. Ch., 343; Leavens *v.* Butler, 8 Port., 380; Jar. on Wills, 741, 744, 973.

2. That J. J. Scott had, by his negligence and laches, renounced the trust, and could not act as executor of the estate at the date of the deed to appellant, citing Paschal's Dig., arts. 1300–1371; Withers *v.* Patterson, 27 Tex., 495; Paschal's Dig., arts. 1269–1294.

Roberts, Chief Justice.—In the trial of this case in the District Court, a jury was waived, and, both matters of law and matters of fact being submitted to the judge presiding, judgment was rendered for the plaintiffs, who are appellees in this court.

There is no question but that the land in controversy is the property devised by Mrs. Scott to her children, who are the plaintiffs. Was it her separate property that was so devised? The evidence showed that the husband, J. J. Scott, having become insolvent in Virginia, his property was sold; and that some of the negroes that were sold were purchased

by her brother, and they, with other means, were given by him to his sister, for the purpose of securing her a home and a provision for a livelihood in Texas. It does not appear what portion of this property, if any, was applied to the purchase of the land in controversy; and if it had been by the laws of Virginia, such a gift there would not make it separate property of the wife. It is unnecessary to consider what would have been the result of a gift of specific property, to take effect by being invested in a homestead for her in Texas. This evidence, however, in connection with that which shows that J. J. Scott was largely indebted, will serve to explain why the title to the land was taken in her name, and that it was to make the land her separate property. If it had been shown that the money paid for the land was his separate property, the deed being taken in her name would raise a presumption that it was a gift by him to her, so as to make it her separate property. (Smith *v.* Strahan, 16 Tex., 321; Id., 286.) Though the same presumption might not be raised if it had been shown to be community property, still that result might be reached by other additional facts, such as his declared intention to make it her separate property, and his continued recognition of it as hers, which was shown in this case. (Story *v.* Marshall, 24 Tex., 307; Higgins *r.* Johnson, 20 Tex., 393.) He must have been cognizant of the fact that the deed was made in her name, which, we may reasonably conclude, was done at his instance; he represented it to others as her separate property, and it was so regarded by the neighbors; he caused her will to be written, in which it is treated as her separate property; he had it probated, and received and acted upon letters of executorship under her will; permitted the children to manage the property in pursuance of the objects of the will, returned an inventory of it under the will, and sold to the defendant Baldridge as executor of his wife's will, assuming to act under the power conferred upon him in the will. As to Baldridge being a purchaser from him in such capacity, the evidence establishes it to have been

her separate property, by virtue of its having been at least a gift from the husband to the wife, or an appropriation to her of the property, freed from any claim on his part of any interest on account of its being purchased with community property, or with his separate property.

The next question is,—Did he have power under the will to sell the land to the defendant? The will did not vest the property of her estate in him, with a trust for its management, but vested it directly in the children, with the specifically-declared object of their support and education, and conferred on him a power of management, control, and disposition, at discretion, for that object. The power was without restriction in terms; and if the land had been sold for the purpose of changing the residence of the children, and as good or a better place had been bought for them with the means, his authority to have done so would hardly have been called in question.

Without, therefore, any critical examination of this question, which has been ably argued on both sides, we may pass on to the consideration of the third question, which is,—Was the land fraudulently sold for an object not in pursuance of the will, and did the purchaser have notice of that fact when he bought the land? A purchaser cannot make a valid contract with one who sells to him under a power, when he has notice that the sale is fraudulently made for a different purpose than that for which the power was given, by which he will aid in the perpetration of the wrong done to others. The evidence that J. J. Scott had gone into merchandise as a business the year before the sale, that he was in great need of the money, and that he immediately started with it to New York, establishes the fact clearly that his object then was to turn the estate into merchandise, and use the money for which the land sold for that purpose, which was an object certainly not contemplated in the will, but directly contrary to its express terms. That Baldridge had notice of such intended perversion of the most valuable part of the estate, is not directly

proved. Still there were circumstances tending to prove it, of sufficient weight to raise a reasonable presumption in its favor. The defendant must be held to have known the terms of the will, which was of record, under which he took his title to the land; and, being a near neighbor, he must have known that the children had been living on the farm, managing it, and making on it good crops for their support, which was the leading object of the will, as expressed in it; that J. J. Scott had established himself as a merchant at a different place from the farm, and was offering to sell the farm, and did sell it for cash in hand at a reduced price, and in no part of the transaction was there any expression used, as shown by the evidence, that the sale was made for an object consistent with the objects of the will. The report of the negotiations for the sale excited the apprehensions of the neighbors that a wrong was about to be done to the children, for which they would seek redress by suit, of which the defendant was warned before the sale was consummated. That doubts of J. J. Scott's right to make such a sale were present in the minds of the parties at the very time the deed was signed, is evidenced by the offer of J. J. Scott to transfer to the defendant a note given by his wife for the land, (that had been paid,) in order to secure him a lien on the land, if his title should fail. The strong expressions of Baldridge, both before and after the trade, show that he was taking a speculative risk of a doubtful title. It is difficult to understand why this trade should have attracted the attention of the neighbors, and have excited the apprehensions of the parties concerned of its legality, upon any other supposition than that it was known to others, as well as to Scott and Baldridge, that the sale was being made for a purpose other than that which was contemplated in the will. It could not be otherwise than that such a family as these children constituted would excite the sympathy of any good community. And if it had not been generally understood that their home, left them by their mother for their support, was about to be sac-

rificed, and the proceeds of it diverted to a purpose foreign
to the objects of her will, this trade could hardly have excited
the apprehensions and elicited the interest which the evi-
dence shows it did, and reasonably should have done, under
the circumstances. The plaintiffs, in their amended petition,
charge collusion and fraud in the sale, and notice of it to the
defendant; and notwithstanding the various circumstances
proved tending to establish it, the defendant offered no evi-
dence, not even his own testimony, to rebut it, and show his
want of notice. This, though negative in its character, adds
weight to the affirmative evidence in support of it. It was
shown that the plaintiffs never received any part of the pur-
chase-money, or other benefit from the sale, and that their
father died insolvent.

The facts having been submitted to the judge, and he hav-
ing found in favor of the plaintiffs, his finding will be re-
garded with the same presumption in its favor as though the
facts had been found by a jury. We cannot say that the
finding was erroneous, under the evidence adduced upon the
trial.

The judgment is therefore affirmed.

AFFIRMED.

### ON MOTION FOR REHEARING.

The foregoing opinion was delivered on the 12th of June,
1877. The minutes of the court were read in open court for
the first time, as appears from the clerk's certificate on file,
on the 15th of June. The motion for rehearing was filed on
the 28th of June. The act of May 2, 1874, authorizes a party
to apply for a rehearing, on filing his motion therefor within
fifteen days after the date of the entry of the judgment or
decision of the court.

*Sayles & Bassett,* for the motion.—On the proposition that
the motion was in time, they cited O'Connell *v.* The State, 18
Tex., 343; Johnson *v.* Smith, 14 Tex., 412; Smith *v.* The

State, 1 Court of Appeals, 411; Price *v.* Likens, 23 Tex., 635; Miller *v.* Richardson, 38 Tex., 500; Hagler *v.* Mercer, 6 Fla., 721; Yonge *v.* Broxon, 23 Ala., 684.

A rehearing in this case is asked, upon the ground that the decision of the court is based upon a question of fact, not raised by the pleadings, not considered by the court below in forming its judgment, and not alluded to by counsel upon either side in the briefs filed in this court.

There may be in the record evidence sufficient to support a finding of the court below upon this issue, had it been made. But, in the absence of any pleadings under which the evidence could be considered, we insist that injustice is done the appellant in affirming a judgment upon an issue that was not considered, and could not have been considered, by the district judge. As to this issue, the appellant has never been heard.

In coming to their conclusion, it is evident that the court did not carefully examine the pleadings in the case, to ascertain from them what issues were submitted to the judge. "Facts not put in contestation by the pleadings, cannot be proven; and if proven, cannot from the basis of a judgment." (Ramsay *v.* McCanley, 2 Tex., 190; Hall *v.* Jackson, 3 Tex., 310; Guess *v.* Lubbock, 5 Tex., 540; Paul *v.* Perez, 7 Tex., 338; McGreal *v.* Wilson, 9 Tex., 426; Chrisman *v.* Miller, 15 Tex., 160; Dennison *v.* League, 16 Tex., 407; Pyron *v.* Grinder, 25 Tex. Supp., 159.)

The evidence commented upon by this court was admissible under the pleadings, but for another and very different purpose. The plaintiffs denied the authority of Scott, under his wife's will, to sell the land. Appellant insisted upon Scott's authority to sell; but if that authority was denied, claimed the equity arising from the transfer to him of the purchase-money paid by Scott, and also that he was a purchaser in good faith. His "good faith" in the purchase, to protect his improvements, became material, if it should be held that the sale was not authorized by the will.

In the entire brief of counsel, which is deservedly com-

plimented by this court, there is not an allusion to the fact that the sale was fraudulently made, for an object not in pursuance of the will, and that appellant, when he purchased, had notice of the fact; nor do they intimate that such an issue was raised by the pleadings, or decided by the court below.

From the statements of the case made by opposing counsel, it may, we think, be fairly inferred, that the evidence of appellant's participation in the supposed fraudulent purpose of the executor, in exercising his power under the will, was not considered by the court, and did not influence its decision; but that, on the contrary, the judgment was based wholly upon the supposed want of power to sell.

No issue as to the fraudulent sale of the land, for an object not in pursuance of the will, and with the knowledge of the purchaser, is presented by, or even hinted at in, the pleadings.

The original petition is in the ordinary form used in the action of trespass to try title. By an amendment filed July 14, 1873, plaintiffs set out the title under which the defendant claims the land, and allege the grounds of its nullity.

The allegations of this amendment are made the basis of the argument of appellees' counsel in this court; and in neither is there even a suggestion that the sale was made for the purpose of enabling Scott to convert the funds to his own use, or that the appellant had knowledge of such fraudulent purpose, if any such existed.

The charge in the petition, that the sale was fraudulently and collusively made, relates to the pretended probate of the will, the filing of the pretended inventory, and the making of the pretended sale and conveyance, when Scott and appellant well knew that under the will there was no authority to sell the land.

The question upon which the decision of the case is made to rest, is for the first time suggested in the opinion of this court, and inferences thought to be warranted by portions of the evidence offered for other purpose are used to support a

finding of the court below, when it is apparent that no such finding was ever made.

Appellant insists that he has a right to have this issue determined by that tribunal whose province it is to determine issues of fact, and that he should have an opportunity to meet the issue now suggested, which by the pleadings in the case he was not called upon to meet on the former trial.

*Breedlove & Ewing, contra.*—The motion comes too late.

In this case, the opinion was delivered and the "judgment pronounced in open court" on the 12th of June, 1877, and the application for rehearing was filed June 28, more than fifteen days afterwards.

The rendition of a judgment is a judicial act; its entry upon the record is merely ministerial, and may take place at any time afterwards. (Freeman on Judgments, secs. 38, 40, 67.)

But in the case at bar this inquiry is not material; for this judgment was rendered, and properly entered on the minutes of the court, on the 12th day of June, more than fifteen days before the application for a rehearing was made. Appellant's counsel argue that the motion was in time, because it was filed within fifteen days after the minutes embracing this judgment were read in open court. This does not appear from the record, but is shown by a certificate of the clerk. The statute, however, says nothing about the reading of the minutes; it is the entry of the judgment.

A number of authorities are cited in support of the proposition that "facts not put in contestation by the pleadings cannot form the basis of a judgment." But it seems that the issue of fraud was put in contestation, and the next paragraph admits that the evidence commented upon by this court was admissible under the pleadings. With what reason, then, can it be insisted that the judgment is based upon facts not put in issue? If " there is in the record evidence sufficient to support the finding of the court below upon this issue,"

and if "this evidence was properly admissible under the pleadings," this court could scarcely do otherwise than affirm the judgment.

But it is said that while this evidence was admissible, yet it was "for another and very different purpose." We insist, however, that as this proof was admitted without objection, in support of the averments of the plaintiff's petition, it was properly before the court for all purposes, and must be taken for all it is worth.

The question of fraudulent intent is one of fact, to be submitted to the jury, and they are the judges of the weight and amount of evidence necessary to establish it. (Briscoe *v.* Bronaugh, 1 Tex., 339; Jernigan *v.* Wainer, 12 Tex., 193; Wells *v.* Barnett, 7 Tex., 587.) In the case at bar, the court having been substituted for the jury, its decision upon the facts has the same conclusive effect as the verdict of a jury. (Jordan *v.* Brophy, 41 Tex., 283; McFarland *v.* Hall, 17 Tex., 690; Gilliard *v.* Chessney, 13 Tex., 337; Rich *v.* Ferguson, 45 Tex., 399.)

For the reasons we have given,—first, because the motion was not made in time; second, because a rehearing cannot be granted after the term, the judgment having become final; and, third, because the application presents no meritorious ground for reopening this case,—we respectfully ask that the motion be refused.

## ON REHEARING.

ROBERTS, CHIEF JUSTICE.—It is contended that this motion for rehearing is in proper time, having been filed within fifteen days from the time the minutes of the judgment entry were read in court by the clerk, though not within fifteen days of the time the judgment was pronounced from the bench. The judgment was pronounced on Tuesday, and the minutes were read on the succeeding Friday.

It must be presumed that the judgment entry was made on the day the judgment was pronounced, and to take effect from

that date, so far as this motion is concerned, unless the judgment entry was suspended by the order or direction of the court, of which there is no evidence in this case.

The statute confers the right to one party to make this motion " within fifteen days after the date of entry of judgment or decision of said court"; and to the other, the right to be allowed five days, after service of notice of the motion, before the motion shall be heard and determined. (General Laws, 14th Leg., page 215.) The party in this case stands upon the right conferred, without making any showing why the motion was not sooner made.

There might be such circumstances of excuse, for not having made the motion, as would induce the court to entertain the motion, though made after the expiration of the fifteen days, if made during the term at which the judgment was rendered. Or the nature of the error into which the court may have fallen might be such that the court, upon being informed of it, or upon discovering it, would during the term correct the error, and, if necessary, set aside the judgment rendered.

We have again looked into this case, to ascertain if there has been any such error.

The point made is, that the pleadings did not put in issue the question of fraud, in exactly the view in which it is presented in the opinion of this court, in deciding the case. In support of this, the brief of opposite counsel is referred to as relying mainly upon another and different view of the case.

The case was submitted to the judge upon the trial, both upon the facts and the law, and he decided upon the facts and law, with reference to the issue made by the pleadings, in favor of the plaintiffs. We have no means of ascertaining the exact views of the judge, if that were material, otherwise than by the transcript of the record as it is presented in this court.

The question presented to this court was,—Can this court say, and point out wherein, the record does not present an

issue in the pleadings, and facts sufficiently to sustain it, which will support the judgment of the court rendered in the District Court? That was by no means a plain question, of easy solution. After repeated examinations of the record upon that question, the conclusion was arrived at that we could not. We now, upon a full examination, are still satisfied with that conclusion.

The motion is dismissed, at the cost of appellant, because not filed in time; the suspension of the judgment, ordered at Austin at the last term, is revoked, and the clerk of the Supreme Court at `Austin is ordered to issue a mandate forthwith thereon; and it is ordered that this judgment, with the papers and opinion, be sent to the clerk at Austin, to be there entered by the clerk of said court as a judgment of the last term of the Supreme Court at Austin, and the clerk here will send, with a certified copy of the proceedings in this court, a copy of the bill of cost in this court.

MOTION OVERRULED.

[This case was submitted and decided during the Austin Term, 1877, and was taken to Tyler, and there finally disposed of, on the motion to rehear, on the 16th November, 1877.]